**PRUDENCE REALIZATION CORP.**

v.

**JACKSON et al.**

**No. 120, Docket 22833.**

United States Court of Appeals, Second Circuit.

Argued Jan. 6, 1954.

Decided April 26, 1954.

Percival E. Jackson, New York City, for appellants executors of the last will and testament of Philip Segall, deceased.

Delafield, Marsh & Hope, New York City, for appellant The Hurd Committee.

Hoffman, Bondi, Buchwald & Hoffman, New York City, for appellant Ernest G. Laubenheimer and others.

Edward Endelman, New York City, for appellant and appellee Ada L. Druskin.

Samuel Silbiger, Brooklyn, N. Y. (Koenig & Bachner, New York City, on the brief), for appellants and appellees George E. Eddy and Gottlieb Trading Co. and others.

Robert Satter, New York City (Benjamin, Galton & Robbins and Harold M. Foster, New York City, on the brief), for appellants Kimmelman Group.

William P. Palmer, New York City (Root, Ballantine, Harlan, Bushby & Palmer, Everett I. Willis, and Kent V. Lukingbeal, New York City, on the brief), for appellees Reconstruction Finance Corp. and Consolidated Realty Corp.

Charles M. McCarty, New York City (Delafield, Marsh & Hope, New York City, on the brief), for appellees Prudence-Bonds Corp. (New Corporation) and City Bank Farmers Trust Co., as trustee.

James F. Dealy, New York City (Irving L. Schanzer and Ralph E. Stone, New York City, on the brief), for appellee Prudence Realization Corp.

Before CHASE, Chief Judge, CLARK, Circuit Judge, and GIBSON, District Judge.

**CLARK, Circuit Judge.**

This appeal, the latest in long protracted reorganization proceedings, under former § 77B of the Bankruptcy Act, 11 U.S.C. § 207, of Debtor, The Prudence Company, Inc., presents for interpretation the provisions of the Plan of the Reorganization of the Debtor confirmed on May 26, 1939, which defined the conditions under which creditors became "Paid-Up Participants" under the Plan. We shall not rehearse here many of the details of this reorganization brought out in previous appeals to this court,[1] but shall restate only such facts as are necessary for the understanding of the issues here presented. Three separate appeals have been taken from a decree of the District Court confirming (with a quite minor exception) the report of Special Master James G. Moore,

---

1. Among the forty to fifty appeals we have heard involving this Debtor and its principal, Prudence-Bonds Corporation, we may cite for the initial proceedings: In re Prudence Bonds Corp., 2 Cir., 75 F.2d 262; In re Prudence-Bonds Corp., 2 Cir., 77 F.2d 328, certiorari denied President and Directors of Manhattan Co. v. Prudence-Bonds Corp., 296 U.S. 584, 56 S.Ct. 95, 80 L.Ed. 413; In re Prudence Co., Inc., 2 Cir., 79 F.2d 77, certiorari denied Egbert v. Callaghan, 296 U.S. 646, 56 S.Ct. 247, 80 L.Ed. 459; In re Prudence Bonds Corp., 2 Cir., 79 F.2d 205, 212, certiorari denied Chemical Bank & Trust Co. v. Prudence-Bonds Corp., 296 U.S. 652, 56 S.Ct. 368, 80 L.Ed. 464; In re The Westover, 2 Cir., 82 F.2d 177. For recent decisions see: Prudence Realization Corp. v. Prudence-Bonds Corp., 2 Cir., 189 F.2d 931; In re Prudence-Bonds Corp., 2 Cir., 192 F.2d 440; Prudence Realization Corp. v. Prudence Bonds Corp., 2 Cir., 198 F.2d 19; Prudence-Bonds Corp. v. State Street Trust Co., 2 Cir., 202 F.2d 555, certiorari denied 346 U.S. 835, 74 S.Ct. 47; and Chemical Bank & Trust Co. v. Prudence-Bonds Corp. (New Corp.), 2 Cir., 207 F. 2d 67, citing other cases at page 70, note 1, certiorari denied 347 U.S. 904, 74 S.Ct. 429.

made upon reference of a petition by Prudence Realization Corporation for a decree enforcing the confirmation of the Plan and settling the paid-up status or otherwise under the Plan of various creditors or groups of creditors. Since in each instance somewhat different considerations control, we shall take up each of the appeals separately and seriatim.

## I. Status of Claim of Reconstruction Finance Corporation

In June, 1932, Reconstruction Finance Corporation loaned to The Prudence Company, Inc., Debtor, $20,000,000, secured by certain property of the Debtor, and guaranteed by the Debtor's parent, New York Investors, Inc., and, to the extent of $1,000,000, by several individual guarantors. The Debtor defaulted and the property pledged by it as collateral to secure its obligation to the RFC was sold at public auction under supervision of the District Court at upset prices approved in advance, and was bid in by the RFC for $11,321,909.39; that amount was credited against the RFC's total claim against the Debtor for principal, interest, and expenses, and thereafter the RFC's claim was finally allowed in the reduced amount of $11,347,775.50. Subsequent to the reorganization Prudence Realization Corporation, successor to the Debtor, has paid a total of $970,234.81 against this claim.

As stated, the RFC loan was guaranteed by Investors and certain individuals. Investors' guarantee was secured by certain collateral, which was foreclosed and sold, with court approval and after competitive bidding, to the RFC for $3,100,000—a price in excess of the prearranged upset price. The RFC further received amounts aggregating $1,281,199.04 from Investors and the individual guarantors. On the Investors' collateral, bid in at the foreclosure sale, the RFC has since realized some $17,500,000 in principal and income. The issue here presented is whether the sums realized from the guarantors and the collateral they supplied render the claim "paid up" within the Plan of Reorganization of the Debtor.

Under the Plan as finally approved, Realization, the Debtor's successor, was to proceed as promptly as deemed advisable by its Board of Directors with an orderly realization of its assets and the eventual reduction thereof to cash. From time to time it was to distribute such cash pro rata among the participants in the Plan until all the participants should become Paid-Up Participants. Art. IV, 3(a), of the Plan provides:

"When from all sources (whether from the New Company or otherwise) the full amount of a Participant's claim, as finally allowed in these proceedings, shall have been realized in cash in respect of the obligation to which such claim relates (or in respect of any property acquired either in connection with the collection of such claim or obligation, or by deed in lieu of foreclosure, or in exchange for any such obligation or any property so acquired) such Participant shall be deemed a Paid-Up Participant and shall not be entitled to share further in any distribution under the Plan until all other Participants become Paid-Up Participants."

Art. I defines "The phrase *obligation to which a claim relates* or its substantial equivalent" as "the obligation, or interest therein, on which (or on the guarantee of which), such claim is based and shall be deemed to include any obligation or interest therein issued in lieu of, or in exchange for, such obligation or interest therein."

It is urged on this appeal that in determining the RFC's Paid-Up status the cash received from guarantors must be included. It is further urged that the Investors' collateral was acquired "in connection with the collection of such claim or obligation," within the meaning of Art. IV, 3(a), or that in any event no "cash" was involved in its acquisition, but merely a credit against the RFC's claim in Investors' bank-

ruptcy, and that accordingly the foreclosure price did not fix the sum realized on said collateral, but that all subsequent realizations on it until the RFC finally disposed of it must also be included. The Master and the District Court held otherwise, and we agree.

It must be borne in mind throughout the discussion that of all the participants in the Prudence Plan the RFC was the only one to which the Debtor stood in the relationship of primary obligor. All of the other claims were allowed by virtue of the Debtor's guarantee of certain securities issued by Prudence-Bonds Corporation, a primary obligor of New York realty mortgagors in the Prudence organization also in bankruptcy and reorganization in the court below. This distinction is reflected in the definition of "obligation to which a claim relates" set forth above. The definition recognizes the difference between an obligation and a guarantee of an obligation. It expressly includes the Debtor's primary liability to the RFC and its guarantor liability to the various security holders, since all of these were obligations on which claims against the Debtor were based. It also includes the primary obligations of Prudence-Bonds Corporation and others, on the guarantee of which the security holders' claims were based. It does not include the secondary liability of the RFC's guarantors, for those obligations did not and could not ground a claim against the Debtor.

By the same token this definition excludes the RFC's guarantor collections from "cash * * * in respect of any property acquired * * * in connection with the collection of such claim or obligation"; for the collateral of guarantors was acquired in connection with collection not of an obligation to which the RFC's claim related, but, as pointed out above, of the secondary obligation of the guarantors.[2]

Recognizing this difficulty, appellants contend that "cash *in respect of* the obligation" is far broader than payments made directly *on* the obligation, and in fact includes payments "in connection with" or "relating to" the obligation, among them the payments by the RFC's guarantors. A study of the use of the phrase "in respect of" throughout the Plan must however defeat this argument. Under the proffered meaning the parenthetical explanation of payments to be included in determination of Paid-Up status would be entirely unnecessary, since realizations on property acquired in connection with the claim would certainly relate to the claim. Furthermore, the provisions of Art. IV, 2(ii)(2) and (b), concerning payments "in respect of principal," as distinct from interest, would make no sense. We conclude that "in respect of" means "to be credited against," and that payments by the RFC's guarantors are not included.

The phrase "all sources (whether from the New Company or otherwise)" need cause no difficulty. The Debtor had guaranteed a variety of Prudence-Bonds Corporation and other obligations, each secured by different collateral. At the time of the adoption of the Plan it was impossible to tell which of this collateral would subsequently prove valuable and to what extent. Accordingly the participants agreed in asserting their claims against the Debtor-guarantor to take account of future collections from their third-party principals and thus to some extent to equalize the risks and prospects of ultimate repayment. "All" and "or otherwise" refer,

2. To the contention that the definition clause relied on, as well as the parenthetical explanation of payments to be included in determination of Paid-Up status, was added by amendment subsequent to the approval of the Plan by the creditors and can therefore have affected no substantive change, it is sufficient answer that the District Court in approving the amendments held that they were not materially adverse to the interests of any creditor. This also confirms our conclusion that they were merely declaratory of the basic scheme of the Plan as it appears through all the provisions.

therefore, to these anticipated third-party payments. As we have seen, however, payments by the RFC's guarantors were excluded from this scheme; and the secondary nature of these obligations justifies the exclusion.

Our decision is supported by a general reading of the other provisions of the Plan, which continually recognize the unique nature of the RFC's claim and which are repeatedly drawn expressly to include the other sources of the guarantee claimants, while remaining silent as to or expressly excluding the RFC's other source. The history of the Plan points to the same result. The series of proposals and objections thereto is replete with attempts to make the RFC account for the value of its guarantees. The very issues now before us were then fought and decided in favor of the RFC. Appellants attempt to show that the early debate was limited to the *pro rata* share in intermediate distributions and to the extent of the RFC's finally allowable claim, leaving undisputed the Paid-Up provisions here in issue. But the only argument put forward in support of this contention is the one hinging on "all sources (whether from the New Company or otherwise)" which we rejected above. This history is thus also persuasive in favor of the result we have reached.

Finally, two claimants assert that the RFC's total receipts from the Debtor and guarantors, including the post-foreclosure interest on collateral, have exceeded the full amount of the original loan, together with interest to date; and that in this situation equity will decree that the RFC is Paid-Up and indeed that the excess be turned over to the Debtor for the benefit of other creditors. In answer to this contention it will suffice to point out that the calculation includes receipts from the guarantors and that, if an overpayment existed, it would equitably inure to their benefit, rather than to the Debtor's. By the same reasoning the argument for reducing the RFC's rights under the Paid-Up section must fail, for that is the practical measure of a par-

ticipant's recovery and the proposed reduction would be equally prejudicial to the rights of the guarantors. Thus the Master and the District Judge were not in error in deciding that the RFC is not a Paid-Up Participant under the terms of the Plan.

## II. Status of Claims Upon Retired Bonds

As noted above, most of the claims against the Debtor were based on its guarantee of certain securities issued by the bankrupt Prudence-Bonds Corporation. These included 18 series of First Mortgage Collateral Bonds and 47 series of Mortgage Participation Certificates. The reorganization of Prudence-Bonds Corporation resulted in a Plan whereby the collateral securing each bond series was given over to a trustee. The trustee, among his other duties, was charged with creating a sinking fund from sums realized on the collateral; and from time to time he was to use the fund thus created to "retire" bonds of the series. When all of the bonds of a series were thus "retired," the surplus collateral was to be distributed to the other trust funds of series in which there remained "unretired" bonds. The Plan was to be, so far as legally possible, without prejudice to the rights of the bondholders against the instant Debtor arising out of the Debtor's guarantee.

Pursuant to this Plan, bonds in the various series have been bought in by the trustees, cancelled by perforation, and (subject to an agreement between Prudence-Bonds Corporation and the instant Debtor that the act should be of no legal effect) cremated to solve a growing storage problem. The Special Master held that the Debtor's obligation on bonds thus "retired" continued until they became Paid-Up by receiving cash from the collateral (the retirement operation) and the guarantee in the full amount of the claim which they represented. The District Court agreed.

The appellant here—one Druskin, a competing creditor—asserts that "re-

tirement" of the bonds worked an extinguishment of the debt and hence an extinguishment of the guarantee. The argument is that either the obligation was satisfied, discharging the guarantor, or else in any event the retirement extinguished the lien on series collateral without consent of the guarantor and therefore released the latter. In this view the trustees are no longer entitled to share in distribution by the Debtor to the extent of bonds thus retired. Appellant also raises some question as to whether the guarantee claims ever passed to the trustees, and finally asserts that the result below works an unlawful preference.

■ It is clear that had the bondholders of a series sought privately to pool their operations and buy up claims from the members of the pool, the results would have been to continue the claims in force. What then is the effect of the trustee's agency and the bankruptcy court's approval? We think these factors will not here serve appellant's case. The bonds represent obligations of Prudence-Bonds Corporation, while the "retirement" operation in each series was conducted by the trustee for the benefit of the series with funds derived from series security. When it is recalled that the Plan of Reorganization of Prudence-Bonds Corporation sanctioned these operations and that the Plans for individual series bonds under which they were conducted expressly sought to preserve all rights against the instant Debtor arising from its guarantees, it is apparent that we have here no such merger as would extinguish the debt and hence the claim of the bonds. It was the clear intent of the parties that the debt and its guarantee should survive, and that intent must control.

Nor is there more substance in the argument that "retirement" released the bond lien on security and thereby released the guarantor. Despite certain language in In re Prudence-Bonds Corp., 2 Cir., 192 F.2d 440, 444, it is doubtful whether "retirement" does more than subordinate the "retired" bond to others in the series; but if there is a release, we think it worked not by the claimant, but by the bankruptcy of Prudence-Bonds Corporation. Moreover, the Debtor must be taken to have consented to the "retirement" practice, since Art. IV, 3(c)(ii), of the Plan expressly provides for payment on "retired" bonds to the custodians of the respective sinking funds.[3] Appellant's attempt to escape the impact of this clause so strains the language and setting as to be frivolous.

As to the validity of the custodians' title to the guarantee claims, there can be little dispute. We have some doubt, in view of § 7 of the Order of May 26, 1939, whether after the effective date of the Plan the claim on a bond and the claim on its guarantee could be separated; but we need not decide this issue, since the guarantee contract was endorsed on the bond. For absent an express reservation, and none appears in the record, a transfer of the evidence of the guarantee must be deemed a transfer of the guarantee claim. Stillman v. Northrup, 109 N.Y. 473, 17 N.E. 379.

The assertion of unlawful preference is equally frivolous; for the pooling of assets of a bond series cannot serve to enrich the series participants or in any way enlarge their share of the general distributions. At most they have failed to yield a preference to appellants, a position for which they cannot be criticized. The District Court was accordingly correct in holding that "retired" bonds should continue to share in distributions until Paid-Up.

### III. Status of Claims of Bond and Certificate Holders Receiving Interest After Bankruptcy

In order to reach their conclusion that several of the bond and certificate series

---

3. It is urged that this clause cannot have effect here, since it was added after the creditors had approved the Plan—a contention, however, which we have already considered and disposed of in note 2 supra.

were "Paid-Up," the Master and the District Court applied interest payments on the underlying security received by these series claimants after the date of bankruptcy. They held that post-bankruptcy interest was properly includable in the "Paid-Up" calculation to the extent that pre-bankruptcy interest was a factor in the finally allowed claims. Appellants on this appeal challenge the propriety of that result, asserting that no post-bankruptcy interest payments should be included until they exceed post-bankruptcy accruals.

It is manifest that the participants, in entering the Plan, agreed, as was their privilege, to modify the general rules of bankruptcy distribution. Thus, though entitled to prove for the full amount of their loss as of the date of bankruptcy, they agreed to adjust their participation in the Debtor's assets to reflect the value of their claims against their primary obligors. It was plainly their object to equalize the advantage accruing to those participants whose security ultimately proved valuable.

As noted, the Plan provided that a participant should cease sharing in distributions when he had received from the Debtor and the primary obligor the full amount of his allowed claim "in cash in respect of the obligation to which such claim relates." Our problem is to determine to what obligations these post-bankruptcy interest payments relate, and thus whether or not they are within the quoted provision.

There are three sets of obligations which we must consider: the guaranteed principal debts, the guaranteed interest arising prior to the bankruptcy, and the unguaranteed interest arising after bankruptcy had cut off the Debtor's guarantee. In determining each participant's share in the intermediate distributions the Plan, Art. IV, 2(ii), expressly requires deduction from the proved claim of payments in respect of *principal*. The lack of a similar restriction in the "Paid-Up" provisions is significant. This is highly persuasive that in

determining the cut-off we are to look to interest realizations, an interpretation quite in accord with the equalizing approach of the Plan. We find no warrant for reading "cash in respect of the obligation to which such claim relates" to mean "cash in respect of principal," particularly when the latter phrase is elsewhere employed. The Plan recognized the Debtor's liability for the shortcomings of the various primary obligors; but under the "Paid-Up" provisions it clearly directed reassessment of these shortcomings from time to time. That the resulting compromise was equitable cannot be gainsaid.

An argument could be made that *all* post-bankruptcy interest should be considered in determining whether a participant is "Paid-Up," rather than such interest only to the extent that pre-bankruptcy interest was included in the allowed claim. But no one has appealed from the part of the order which thus limited the extent of the participants' accountability; and in any event it seems unlikely that the argument would prevail. It is settled law that a payor may direct application of his payments amongst matured liabilities. Restatement, Contracts § 387(a) and comment *e*, § 388, comment *a* (1932). The payments in dispute were made in respect of interest, and to interest obligations they must be applied. But since the payments were not earmarked to any particular accrual of interest, and since the Plan bars claimants from making an election, the general rule requires application to claims which the payor was under a duty to his guarantor to pay immediately. Restatement, Contracts § 394(1)(a) and comments *a*, *b*. Thus the guaranteed pre-bankruptcy accruals are given priority. If we interpret the Plan as treating these payments as made in the absence of any obligation to a guarantor we reach the same result; for overdue interest will be paid ahead of principal, and amongst otherwise equal obligations for interest the oldest will be paid first. Restatement, Contracts §§ 394(1) and 394(1)(b)(i).

Finally certain creditors also appeal from the stay provisions of the decree. The only payments directed by the decree, and thus stayed until determination of all appeals, were those withheld as doubtful from prior distributions. There is nothing inequitable either in blocking these payments until their legality is determined or, if they are finally upheld, in allowing interest thereon to compensate for the law's delays. The stay does not affect distributions subsequent to the order and hence cannot work the asserted injustices against other creditors.

Thus we find nothing to criticize in the decision under review. Rather to the contrary, the learned Master and District Judge have performed their exacting task with skill, devotion, and fairness. The decree is in all respects affirmed.